And, let's see, we'll take up U.S. v. Osborne. Did we submit that one? That was the one where our argument was vacated. Oh, we vacated argument. It doesn't say that on my day sheet, vacated argument. Okay, we'll take up Chicken Ranch Rancheria of New York Indians v. California. Mr. Mescat? Yes, Your Honor. You may begin. Thank you, Your Honor. Good afternoon. May it please the Court, Deputy Attorney General Tim Mescat, on behalf of the appellants, State of California and Governor Newsom. Your Honors, I would like to reserve two minutes of my time for rebuttal. All right, what's the clock? Your Honors, this case is about statutory construction and how the district court misread two key provisions of the Indian Gaming Regulatory Act, commonly known as IGRA. First, the district court erred in ruling that the category of spousal and child support did not fall within the provisions that could be negotiated under IGRA. And second, the district court erred when it ruled that the state was required to provide meaningful concessions to the tribe, even when negotiating over topics that did not involve a fee or a tax. Both of these issues are critical to the state's ability to negotiate in good faith going forward, and we're asking the court to correct both in this appeal. Turning to the first matter, the definition of a proper subject under IGRA falls under Section 2710D3C. And the specific provision that we're talking about is Subdivision 7, which allows any other subjects that are directly related to the operation of gaming activities. Your Honors, this catch-all subdivision was specifically analyzed by this court in 2019 in the Chemehueve case, which we discussed in our briefs. And Chemehueve talked about two key principles in this catch-all provision. The first is that it is broad in nature, and second, that due to its breadth, it includes topics in addition to those otherwise enumerated in Subdivisions 1 through 5. But that may be, but we have to determine whether or not the particular subjects that I guess the parties are at an impasse on are directly related to the operation of gaming activities. That's correct, Your Honor. And I would like to make one quick point before I talk about the subject, because you mentioned impasse. We submit that under the larger context of whether the state acted in good faith, we weren't at impasse when it came to child and spousal support. If you look at the history of the negotiations that occurred here, the negotiations went on for a couple of years under the former Brown administration. The state and the tribes had reached a lot of tentative agreements during that time. And then when the Newsom administration came into office in January of 2019, there was a few months where the Newsom administration was staffing up in this area, and then there were some initial meetings. But beyond that, the parties did not have a great amount of time to negotiate over the topics. And a lot of that time, as we discussed in our brief, focused on issues where the plaintiff tribes had moved back from the tentative agreements that they had originally reached. So we'd argue that we didn't really get to the issue of child and spousal support. When the plaintiff tribes submitted their last best offer in September of 2019, this is just nine months after Governor Newsom came into office, we specifically requested that the tribes consider engaging in bilateral negotiations. Counsel, can I ask, is it true that the Department of Interior has more recently begun to reject compacts with some of the same types of provisions here? Your Honor, that is correct, and we have asked the Department of Interior to reconsider those determinations. Our main concern, well, we have a lot of concerns, but the real key concern is those decisions do not take into account the Chimueve decision from 2019. And doing so is absolutely critical because Chimueve holds that a subject under the catch-all provision is permissible as long as it is not so attenuated from the gameplay that they fall outside of the paragraph. Right, but so on that metric, why aren't some of these topics that the state is asking to have negotiated quite outside the bounds? I mean, it's not just the child support, but the environmental, the tort, the intergovernmental agreement. I mean, it seems that the whole point of IGRA was that you were going to let states impose some amount of regulation as a condition for allowing the gaming, but we weren't going to let states take over Congress's role in supervising the tribes. And so I think there's a legitimate concern on the other side that that's what's happening here. Your Honor, obviously there are limits to how far the catch-all provision can go, and we certainly would never disagree with that argument. But what the district court got right here is that most of the subjects that were consistent with what this court has previously done in decisions like, for example, Coyote Valley 2 and Chemehueve. Coyote Valley 2 dealt with the issue of the revenue-sharing trust fund, about the state's ability to negotiate over getting funds to non-gaming and limited gaming tribes. Here the court did hold in that decision that that was consistent with the catch-all provision. Issues regarding the special distribution funds and the ability to give funds to local governments regarding the ability to mitigate off-reservation impacts of gaming. Again, that was held to be consistent with the catch-all provision, just as Chemehueve did in the issue of whether term limits for a compact could be included. All of these subjects are covered. Can I ask you how you interpret how the good faith factors play with respect to whether or not a subject is on that list, the seven-item list? Judge Boutime, that's an extremely good question. There is a really interesting legal issue about whether the proposed subjects is a standard that is different or independent than the state's underlying good faith requirement under IGRA. And I wish that I had a clear answer for you. I'm not sure if it's clear under the law. I would say, though, that when you're dealing at least with the catch-all provision in Subdivision 7, that might be an area where it's at least appropriate to consider the state's underlying good faith. When you look at the statute, you look to see whether the proposed bargaining term falls within the seven. If it doesn't fall within the seven and the tribes believe that it's not in good faith, they initiate a lawsuit saying it's not within the seven. Therefore, the state isn't acting in good faith. And then in the lawsuit, it provides that the burden of proof shall be upon the state to prove that the state has negotiated with the Indian tribe in good faith over a provision. And then the court shall order the state and the Indian tribe to conclude such a compact within a 60-day period if it finds that the state has failed to negotiate in good faith. But when the court makes its finding, that's when we consider the public interest, the public safety, criminality. That's the way I understand the statute operate. The district court didn't apply it in this manner. What are we supposed to do? Well, Your Honor, what we're asking is that the court recognize the broad nature of the test that it articulated in Chemehueve, that it find that as long as the topic that we're discussing is the direct and natural result of the tribe's gaming business and would not exist in the absence of the gaming business, that that is appropriate here. We're not talking about any income of any tribal employee. It has to be someone that is employed in one of the gaming activities. And we're not asking for the court under any circumstances to go beyond that. And we believe that's a proper subject as this court found in Chemehueve and as it is found similarly in the Coyote Valley case. So the Department of Interior has written letters saying we disagree with the but-for approach. Are you arguing for the but-for approach? Your Honor, I think that the approach that we would argue for is what this court decided in Chemehueve, which is that the proper subject is not so attenuated from the gameplay that they fall outside of paragraph catch-all provision. We think that language is consistent. We think this court got it right in Chemehueve. And with respect to the Department of Interior, we believe they should have honored the Chemehueve analysis. Hypothetically, if a state were to go well outside the catch-all, I know you think that you haven't done so here, but imagine another case where it's conceded that the state has gone way outside. Is that automatically a lack of good faith, or could the state then come and argue, nonetheless, you know, this is in the public interest or perhaps we've given material concessions and so it should be fine? And again, Judge Brest, thank you for the question. It's a difficult question. It's one that really does put me on the spot. But at the end of the day, it is proper for this court to rule that it has to be a proper subject under negotiation. And we understand that. The only point, the larger point I wanted to make, though, was that we don't think the parties were yet at impasse. The tribes should have, at the very least, joined our offer for bilateral negotiations so we could talk about it more and perhaps drop this subject. It is an interesting aside that if you look at other compacts that the state has recently entered into, this is a topic that has been dropped. It was never – I'm sorry. Finish your thought and then I have a question. There is nothing in the record stating that the state ever took the firm position that you must have child or spousal support or we won't compact with you. That didn't happen. What is the practical effect of a court ordering the IGRA remedial provisions to take effect? Set aside the material concessions component of the district court's ruling, but just if you get a court order telling you you have not acted in good faith, what is the consequence to the state? Well, Your Honor, I mean, the one practical consequence in this case is we don't have the ability to talk about other subjects like child and spousal support, which may mean we could reach an agreement through compromise, and we think that in and of itself is important. And also the state loses its ability to basically be a compacting party, which is one of the purposes that IGRA was all about. So we do think that's important. Before I lose all of my rebuttal time… Sir, I actually have one more question for you. Yes, Your Honor. Is there any settlement talks now? Because if I recall correctly, the compact ends in June of next year, and I believe the parties believe that if we didn't issue a decision by December, which we are at now, then there's no way for this to play out before the compact ends. So what's going to happen if this court doesn't reach a decision before June? Your Honor, it's a great question, and thank you for asking it. It is absolutely critical, because the next phase is that we go to a mediator, and the parties have to submit their last best offers. And the state is now really in a bind, because under the district court's analysis, we are required to make meaningful concessions for subjects even when they are not tax and fee related. And we just think that this is an absolute bright-line test. With all respect to the district court, it really got it wrong on this issue. When you look at the existing Ninth Circuit… But what happens if the litigation continues past June of 2022? Your Honors, I would hope that when this court issues a decision that clarifies IGRA, the parties will be able to conclude their compacts. So you need us to act as quickly as possible. Is that what you're saying? It is, and with all due respect to Mr. Marston, we just have a difference of legal opinion on these two issues, and we really need this court to resolve it. It will help the state, it will help the tribes, it will certainly help everyone move forward. Is there any extension of the June 22 deadline or expiration date? Two quick points, Your Honor. From our perspective, it would have to be approved by the California legislature, which makes it difficult. But at the end of the day, the state's ability to actually enforce anything probably doesn't exist. Your Honors, unless there are no further questions… I have a couple more questions, but also I will give you time for rebuttal, so don't worry about that. I realize we're taking up a lot of your time with our questions. Another further question I have is, if the subject of the particular proposed provision is not directly related, could the state and the tribes nevertheless negotiate it into their contract? Oh, yes, Your Honor, absolutely. IGRA is about cooperative federalism and encouraging the parties as a sovereign-to-sovereign basis, working out deals that work in the best interest of both tribes. Does the Department of Interior agree with that? Your Honor, I'm not sure. So, I guess what I'm suggesting, it seems as though this big subsection C says that any tribal state compact may include provisions, and then it only prohibits tax fees, charges, or other assessments, but it doesn't say anything directly about the subject matter, say, of Juris 7, if they don't fit clearly with indirectly related. Your Honor, I agree that as co-sovereigns, the parties, particularly 20 years into IGRA, where the tribes are represented by very sophisticated counsel, can work out these deals, and they are proper for IGRA compacts. All right, and to follow up on a question from Judge Bumate, what happens if there's no compact? What would happen if we didn't reach our decision quickly enough? But I didn't see anything that said this case was expedited or anything like that in our records. So, what's the dire consequences? Your Honor, the appeal timeline was expedited, and the reason is because a mediator is going to have to choose between competing compact proposals without guidance from this court as to what is a proper subject and whether or not meaningful concessions are required for non-tax subjects. And frankly, I'm not sure if the mediator is going to be able to do that absent direction from this court. So, for that reason, we believe that an opinion from this court is important, and we'd request that it come sooner rather than later. So, the mediator could act, I'm sorry, while before we issue an opinion? Absent some stay, we believe yes, Your Honor. Okay. Has anyone requested a stay? We have, and the result was we got this expedited process, which we greatly appreciated. I mean, was a stay entered or not? It was not. Okay. A stay was entered, I'm sorry, let me correct that, Your Honor. At the district court level, a stay was entered so we could file this appeal on a very quick basis. Okay. So, the mediation has stayed? The mediation has not stayed at this point, Your Honor. It is going forward. It is going forward. So, have you submitted your last best offers? Not yet. And is there a deadline for doing that? I think that the first step in the process will be that the court has to appoint a mediator, and here the parties have reached an agreement on who can be appointed. So, that clock begins to tick the moment that the appointment is made, but it has not yet occurred. Just to make sure I understand your position, that the mediation, absent a stay, the mediation is going forward, but your position is that effectively the mediation cannot be completed until this court reaches a decision that would provide guidance to the mediator? Your Honor, we believe that is the best case outcome, and if the opinion, for whatever reason, cannot come quickly, we are likely to renew our request for a stay. Not because we want to delay the litigation, but because we do think it's so important that the mediator get guidance from this court. But, and if I'm correct, ICRA requires the mediator to decide within 60 days? I believe that's, I believe it is within 60 days after the last best offer compacts are provided, but Your Honor, I apologize, I'm not sure. Yeah, okay. I'm sorry, if a mediator makes a decision, would that move this case out? Um, I don't believe so, Your Honor. All right, does the secretary still have, after the mediator makes a decision, does it still go to the secretary for approval or disapproval? It would go to the state or the parties to see if they would be willing to consent, and if that doesn't happen, it then goes to the secretary for procedures. All right, thank you. All right, Mr. Marston, we will hear from you now. Thank you.  Good afternoon, Your Honors. My name is Les Marston, and along with my colleague, David Dana, we represent the five appellee tribes in this case. The starting point for this court's analysis is the catch-all phrase. That phrase says that any other subjects that are not within the first six have to be directly related to the operation of gaming activities. So as this court held in Rincon, by limiting the proper subjects of the negotiation, by enumerating them to seven, Congress sought to limit the subjects that the parties could negotiate over to those seven. When Congress inserted the word directly into the catch-all phrase, Congress again sought to limit the other subjects that the parties could negotiate over to those that are directly related to the operation of gaming activities. So let's take a look at the phrase. First of all, our position is that the start of your analysis is to give those words in that phrase their plain, ordinary meaning. We think the phrase is clear and unambiguous and requires no interpretation. If you give those words their plain, ordinary meaning, what do they say? All right, directly related. That means there has to be a direct connection. A direct connection between the topic and the operation. What's the plain meaning of the operation? Well, it's the performance of the games. And it's the operation of the gaming activities. You need to go no further than the United States Supreme Court's decision in Bay Mills to know what those words mean. Bay Mills specifically held that gaming activities is the gambling. It's what occurs on the casino floor. Yes, Counsel, what do we do with our Chemi-Webby case, which required the tribes to negotiate with labor unions? Well, when I argued that case to the Ninth Circuit, Your Honor, in my briefs, first of all, that case is clearly distinguishable. It's not a bad faith case. The tribes had a compound. Second of all, it required the interplay between two statutes. Yes, the catch-all, but a separate statute. In addition, the Chemi-Webby case is consistent with what I'm arguing here. Because what the court ultimately held was when the games start and when the games stop is directly related to what goes on in the casino. Every roll of the dice, every spin of the wheel. And as opposing counsel said, Chemi-Webby stated, it was dicta, but they stated that the state can't be wanting to negotiate a subject that's too attenuated from the gameplay. So we're here today to tell you, look at the record. Look at the eight subjects the state was demanding that we negotiate over. And look and say to yourself, are those subjects directly connected to the... Counsel, assuming we agree with you that, you know, that the catch-all requires something very direct to the gaming operation. And we say we agree with you that the state asked for at least some topics that were outside of that catch-all. What's the next step? The next step is applying the exception that the Ninth Circuit created in Rincon. The Ninth Circuit said it's not per se bad faith for the state to come to the tribes as they did here and want to negotiate over topics that fall out of the catch-all, that are not proper subjects of negotiation. But the subject still has to carry out the purposes for which the IGRA was enacted. And they still have to offer the tribes some meaningful concession. Where does that come from? That's not from IGRA. No, it's not. This is a judicially created exception. The court created this exception. The Ninth Circuit created this exception in Coyote Valley 2 in Rincon. And they defined meaningful concession. They said, to be a meaningful concession, first of all… Yeah, but they defined it, and they only applied it in a very narrow sense when it has taxation or renew generating issues. We've never applied it anywhere else. With all due respect, Rana, I would disagree. Coyote Valley 2 is a good example. There were two fee demands in Coyote Valley 2, the revenue-sharing trust fund and the special distribution. But there was also a demand for labor. And the court, although the court's language, I wish it was a little bit clearer in Coyote Valley 2, they upheld the labor provision and specifically said that the tribes got meaningful concessions in exchange for the labor provision. They got exclusivity, they got a monopoly on the right to offer slot machines and house pay card games. Also in the Ninth Circuit, the Ninth Circuit looked at a district court opinion in the Big Lagoon case that dealt only with the environment and environmental regulations. And that's… Can I? I'm sorry if I can interrupt. My problem with that approach of the meaningful concession is it's completely atextual. But in fact, Edward has given us, has some definition of what good faith is. Why aren't we supposed to apply those factors? I'm not sure I understand your question, Your Honor. Before I answer it, I want to make sure I do understand. Yeah, I'm sorry. 2710D7B3, Big I, has several factors that we are supposed to use to determine a state's good faith, which includes public interest, public safety, criminality, financial integrity. Why aren't we supposed to use those factors instead of a meaningful concession test? Well, a couple of things, Your Honor. It's not just any public interest, right? Because, for example, the state's got a real strong public interest in ensuring that groundwater within the state is maintained on a sustainable basis. Yeah, but Congress put that in there. That's not for us to second guess. Agreed. Congress also put in 2702 that the state's interest, and it's interesting that the purposes, Congress says what the purposes of the statute are, and nowhere in the purposes that they're trying to fulfill is the state even mentioned. But they do mention the fact that one of the things that they're trying to do is make sure that the games are played fairly and that criminals aren't involved in the operation. And those are state interests. Those are the public policy interests that I think, in my opinion, Congress is trying to identify in the statute that you're discussing. So we think of, here, the state has proposed eight subjects, only one of which was a fee provision. So if you adopt our position, which is Congress meant what they said and said what they meant, and for the subjects they have to be directly connected to the gambling, only one of their provisions involved a fee. So we win. The other seven provisions are outside of the proper subjects of negotiation. And if we adopt the state's interpretation of the RINCON exception, meaningful concession analysis, that exception doesn't apply to the other seven subjects. So they engage in bad faith negotiations. And let me give you just one example. Since the state brought up spousal support, let me give you one good example. The Chemehuevi tribe, they have a restaurant in their hotel, right? The state's demand defines a gaming facility as amenities. It would include the hotel. The restaurant has a cook. Cook comes in, parks in the employee parking lot, not the patron's parking lot, does his shift, spends all day cooking. When he's done, leaves. The state, under the state's proposal, would take all of the state's laws pertaining to the recognition and enforcement of state court judgments, all of the laws pertaining to the garnishment of wages, impose them upon the state, make the tribe a debt collector or a spousal support collector, require us to garnish those wages, turn them over to the cook's spouse, even though the cook is not involved in the regulation of the gaming, not involved in the playing of the games, never enters the casino. And in fact, his wages don't come from gaming. His wages come from the revenue that's generated by the restaurant. That has absolutely nothing to do with gaming. And I could go through and give you example after example after example on every one of their eight subjects to show you that these eight subjects are just too attenuated from the gameplay. They want you to be successful. They want you to strike, out of the catch-all phrase, the word directly. They also want you to... I guess my problem with your argument is that you also want us to strike the factors that Congress put on determining whether or not the state engaged in good faith. Like the public interest, public safety, criminality. What do you want us to do with that subsection? Well, again, the state's bad faith is determined by what's in the record. So, yes, once we file our lawsuit and we claim that the state is engaged in bad faith, the burden shifts to the state to prove that they didn't. In the record, what did the state... There's no evidence in the record by the state to show that the inclusions of any of these topics fulfill any of the state's public interest or public purposes. So, let me ask you a question on that point. What do we do with some of these provisions that the tribes are arguing now are not directly related but were set forth in the 1999 compact? And some of them were in your take-it-or-leave-it version of the compact that you provided to the state. Well, the tribes aren't going to break their word. We don't speak with forked tongue, Yvonne. In 1999, the state came to us and requested that we agree to an environmental provision, a labor provision, a discrimination in the workplace provision, and a tort provision. And we agreed to include those provisions in there. But we got meaningful concessions. We got something that we never had before. We first got the right to operate slot machines and house bank card games, and we got a monopoly. And that most certainly, if you look at the written contest, most certainly fulfills the purposes for which the IGRA was enacted, right? Because it strengthens tribal self-government, tribal economic development, and it's still related to gaming. Having an exclusive monopoly, while it may not be directly connected, it's related to gaming, and it's a meaningful concession. That's not what's happening. Do you agree with your friend across the aisle that that kind of a provision isn't prohibited by IGRA? That's right. As the Ninth Circuit said in Rincon, it's not per se bad faith for the state to request that the tribes negotiate over subjects that are not proper subjects of negotiations. But they have to, again, offer the tribes a meaningful concession. That has value to the tribes. So the tribes in this negotiation, the tribes' concern is that they're being asked to agree to some of these things that aren't prohibited, but nor are they directly related at this point in time to solidifying sovereign tribal rights or their economic development. That now they already have the casino, so there needs to be additional, some kind of additional bartering concessions on behalf of the state for you to go along with them. Whereas when this first happened in 1999, you got the whole world. You got to have gaming level three on your track record. You're absolutely right. The way we look at this case, Your Honor, is here's these eight subjects. They're not proper subjects of negotiation because they don't fall within the catch-all. So we go to the Rincon exception. That's the only thing that saves these subjects. If the Rincon exception only applies for a demand for fees, then they lose. So the only thing that allows them to survive a finding of bad faith is the Rincon exception. Well, what about the good faith factors? Well, but those are just factors that the district court looks to in evaluating the state's conduct at the table based on the record to determine whether they engage in bad faith. And let's go to the record. Let's look at what happened here. This, you know, because the states are arguing that they didn't have enough time, you know, to adequately evaluate the tribe's offer. You're almost out of time. I just want to ask, what's your position on if this court can't get a decision out in a short amount of time? Because, you know, we're less than almost six months out from the compact ending. Is that right? If you can't get a decision out before June 30th, then the only thing that's going to save the tribes is secretarial procedures. It's the remedial process that Congress established that would allow us to continue to game. Otherwise, our compact runs out. And under IGRA, under federal law, if we don't have a compact, the Johnson Act immediately comes into play. And it is a federal crime for the Indians to engage in gaming without a compact. And all you have to do is look to see what happened back in the early 90s when the tribes were engaging in non-compacted gaming. The U.S. attorneys sent us all demands. They filed suit in federal court. They seized our machines. They started the process to shut us down. And I have no reason to believe that they won't do it again. So, if you don't want the tribes to lose their gaming, hundreds of people to be unemployed, we lose the revenue to provide essential governmental services to our members. You either need to make a decision now or allow the secretarial procedural process to go forward. And it's a quick process. There's not a time limit placed on the mediator, by the way. What happens is, and the state applied not only to the district court for a stay, but applied to the Ninth Circuit for a stay. The Ninth Circuit denied their stay. So, right now what's pending in front of Judge Ishii is our motion for an order to appoint the mediators. The parties have agreed to who the mediator can be. Once the mediator is appointed, then the mediator requests that each of the tribes under the statute say, we have to submit ourselves to the mediator. And it's baseball arbitration. We each submit our proposal and the mediator has to pick one. And he picks the one that he believes best carries out the purposes of the IGRA and is consistent with the court's decision. He then offers one of those to the state, not to us. And the state still gets to elect and decide whether they want to enter into the compact. Well, I don't see the state as a practical matter not wanting to enter into the compact. I mean, I don't see what objectively would be the state's interest in not wanting to enter. Maybe the state doesn't want to enter unless it gets to continue certain of these provisions. But I don't see it as in the state's interest to not enter the compact. But what objectively? Just keep in mind, Your Honor, if the mediator selects the tribe's compact, that's the end of it. But if the mediator selects our compact and offers it to the state and the state doesn't accept it, and I can assure you, our compact isn't going to have the eight subjects that they've proposed. They'll include the environmental provisions and the other provisions that we agreed to in 1999 because, as I said, we gave our word. We then go back to the secretary. And the state knows that if we get back to the secretary, these eight provisions that they want aren't going to be in the procedures. So there is an incentive for them. Don't you really need more time to negotiate? I mean, since these are areas you can negotiate. Well, we negotiated. It's not true to say that there wasn't negotiations over these eight provisions. These eight provisions were in every one, all 12 of the state's offers to the tribes over a five-year period. We requested time and time again, put some meaningful consideration on the table. These subjects lie outside of the proper subjects of negotiation. And the state, Your Honor, we even wrote a paragraph that says, and the tribes wrote a paragraph saying, the tribes will agree to these eight subjects in consideration in exchange for the following meaningful concessions. Left it blank. Sent it over to the state. What we got back from the state was, once again, their compact offer with the eight subjects in it, that provision taken out of it, no comments. Time and time again, we tried to negotiate with the state over these eight subjects. And the state just stayed at the table, sending the compact with the same eight subjects in it, time and time and time again. We finally were running up against the clock. And the state knew we were running out. And the state knew that once the clock runs out, we're in the impossible position of having to make a choice. The choice is capitulate, take their compact with the eight subjects, or shut down our casino and forego gain, which is no choice at all. They've used that strategy very effectively. All you have to do is go, and it's in the record. Look at the other compacts that have been entered into, where the secretary has allowed them to go through by operation of law. All of them contain some variation of these eight subjects. And were those tribes, did those tribes receive meaningful concessions? Those tribes did not get meaningful concessions. And I don't blame those tribes for entering into those compacts. Because a lot of those tribes, like, you know, were new tribes that didn't have casinos. So they wanted to get into gaming. And they couldn't afford to do what we've been doing, which is stay at the table for five years. I mean, if they did, they'd lose, you know, millions and millions of dollars worth of revenue that they desperately need to provide governmental programs, benefits, and services to their members. So they really didn't have a choice. They had to accept the ultimatum from the state. The compact that I say that you're at an impasse on, what's the proposed duration of that compact? Well, we have our proposal, our last best offer to them, allowed for the compact to just remain in effect. It didn't have a termination date. But what we gave the state instead was a provision that allowed a re-opener on any one of the provisions in the compact. And the reason that we put that in there is because the state's offer of a 25-year term, they want to tell you, well, you're getting a better compact, you're getting five more years. That 25-year term deprives these tribes of the right that every single government in this state has, and that's to engage in 30-year bond financing, to be able to take debt and spread it out over a long period of time, attract investors by paying tax-free interest. And we can't do that. We've never been able to do bond financing. So, you know, when is it ever a good time to terminate the tribes' gaming? As long as the state's allowing any person, organization, or entity to play the games, we think it's a good time for us to be doing games. We have the same right. And the state's interests are protected as long as there's a re-opener to allow them to come in at any time and renegotiate any of the provisions of the compact. Right. Does anyone have any further questions? Obviously, we're over time. I do, if I may, Judge Warlaw. I asked the state whether they agreed with the Department of Interior's rejection of certain recent compacts that have been presented to it. Do you have a position on that? The state, I take it, said, we do object, we're going to try to do something about that. What's your view? Well, my view is that the Assistant Secretary has got it right because the Assistant Secretary interprets the catch-all provision exactly the same way we do, that Congress meant what it said and said what it meant. You can't have a subject that's too attenuated from the gameplay. There has to be some direct connection between the topic that they want the tribes to negotiate over and the playing of the games. And for you to move forward, you ultimately have to have the Secretary approve or at least not disapprove your compact? Yes. And think about this, Your Honor. If we right now accepted the state's offer and included the eight provisions in our compact, we've got no compact. We'll send it to the Secretary. He's going to reject it. Okay. Thank you, Judge Wardlaw. Oh, of course. I guess we haven't really discussed each individual provision and how it's directly or not directly related. I'd be happy to, Your Honor, but it's going to take some time. I think we'll move to a rebuttal at this point. Can I just quickly close? Just one statement. You should affirm Judge Ishii's decision. You should affirm it because the state has not met its burden of proof. They have not been able to point to the record to show, and they have not been able to prove to you legally, that these eight topics fall within the catchall. Not only should you approve Judge Ishii's decision, because his decision is consistent with your decisions in Rincon and Coyote Valley. They're consistent with the Ten Circuits decision in Dalley. They're consistent with the Eight Circuits decision in Landrow, and they're consistent with the Secretary's interpretation of the catchall. And more importantly, you should affirm this decision because it supports tribal sovereignty. Thank you. All right, Bett. The district court did not apply the proper good faith standards in subsection D7B3I. So I don't know how we could, wouldn't we have to send it back to him to apply those standards? No. I believe that even if you disagree with the court on some of the topics, the court clearly found that requiring the tribes to recognize and enforce spousal support and child support orders had absolutely nothing to do with gaming. And if you find that the district court was correct on just one of the topics, if one of the topics fell outside of the catchall and did not fall within the exception, then under your decisions in Rincon, that's bad faith. And they have failed to rebut the per se bad faith presumption. And those provisions, as I gave in my example, have absolutely nothing to do with gaming. All right, thank you, counsel. We'll give... You're welcome, Your Honor. We'll give you some time, some rebuttal time now. Oh, you're muted still. Mr. Muscat. Mr. Muscat, you're muted. Thank you, Your Honor. I certainly agree with my friend across the aisle that the plain language of the statute matters. And when you look at the catchall provision, it says directly related to the operation of gaming activities. It does not say directly related to games. It's as if the plaintiff tribe's argument is trying to critically remove the phrase, the operation of. And we believe those words are words that Congress meant. That means that the Bay Mills test in regard to giving a definition for gaming activities doesn't apply when looking at the catchall provision because of that key phrase. Counsel, if we agreed with your opposing counsel that some of the topics were off the list, but we disagree with the district court that you apply a meaningful concession that maybe you're supposed to apply the factors, the good faith factors of public interest, public safety. The opposing counsel said it's your burden to prove and you haven't proved that here. So can we affirm the district court based off of that? Well, Your Honor, we think that a lot of what the judge did here below in terms of finding that it was a proper topic led to a situation where he didn't have to go and make that ultimate decision of whether it was also in the public interest. And to give a couple of examples, we believe that paying your employees who work at gaming activities a minimum wage is clearly within the public interest. We believe that protecting women from sexual harassment and giving them some sort of remedy within the tribal court system is within the public interest. That may be good, but there's nothing in the record that proves that. At least you haven't sustained that burden of proving it here as an alternative argument to the district court's judgment. That's correct, Your Honor. And we haven't done that specifically because we agree with the district court's analysis that they are within the catch-all provision, which includes the operation of gaming activities, not just the play of games themselves. And that was demonstrated by this court's decision in Chemehueve in 2019. That part of the order the judge got absolutely right, and we think it should be affirmed. Moving on to meaningful concessions, it simply cannot be denied that, even though they are not required in this case because we're not talking about AP or a tax, they still existed. We were giving the tribes not only the great deal that they continue to have a monopoly on house-banked games and slot machines, gaming devices, we were also giving them other benefits like another gaming facility, a longer durational term limit, and importantly, something we haven't really talked about much, they would not have to contribute to the revenue-sharing trust fund until they went up to 1,200 games. This is going to have a huge economic benefit for expansion. And again, this was a concession. It was not required, but it was something that the state was continuing to offer. The final point that I want to make is, my friend across the aisle had indicated that we were making one fee demand. We disagree with that. I believe that Mr. Marston is referring to the Tribal Nations Grant Fund when he makes that statement. What's important to remember about the TNGF is that did not require any new funds from the tribes. It was going to be funded by a surplus in the RSTF, which I believe four of these five tribes weren't even making contributions to the RSTF. In fact, four of the five tribes were actually getting TNGF grants. This was not a new fee or tax under IGRA. And then the final thing I want to make in regard to the potential for closures, which I think has really demonstrated a commitment to being true partners in this cooperative federalism process. We are not trying to close anyone down. We have more compacts than any other state in the union, and we have no authority to do that. That is simply something the state has no interest in doing. All right. Thank you, Council. Chicken Ranch Rancheria versus the State of California is submitted.
judges: WARDLAW, BRESS, BUMATAY